PRACTICE MANAGEMENT SUPPORT )
SERVICES, INC., an Illinois corporation, )
individually and as the representative of )
a class of similarly-situated persons, )
                               )     No. 14 C 2032
           PLAINTIFF, )
                               )
      v. )     Judge Thomas M. Durkin
                               )
CIRQUE DU SOLEIL INC., CIRQUE DU )
SOLEIL (US), INC., AND JOHN DOES 1-10, )
                               )
          DEFENDANTS. )

## MEMORANDUM OPINION AND ORDER

In this class action lawsuit, plaintiff Practice Management Support Services, Inc. challenges the alleged practice of defendants Cirque du Soleil, Inc., and Cirque du Soleil (US), Inc., of using a fax broadcasting service to advertise theatrical shows without providing sufficient instructions about how to opt out, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The eight-year procedural history of this case is set forth in two prior orders. R. 63; R. 116. The parties have litigated a variety of procedural issues in state and federal court, and they have engaged in protracted discovery three times. R. 116 at 2. Currently before the Court is Practice Management's motion for class certification (R. 68). For the reasons explained below, the Court grants that motion in part.[1]

---

[1] The Court has considered the supplemental authority defendants have provided, and so the Court also grants defendants' motions to supplement (R. 140; R. 148; R. 150).

**Factual Background**

Defendants produce theatrical shows worldwide under the "Cirque du Soleil" trade name. In January 2009, one or both of the defendants contracted with a fax broadcasting company called ProFax to market shows to a list of fax numbers purchased from list providers. R. 68-6 at 18-19; R. 68-5 at 15-17; R. 68-8. A single employee of defendants was in charge of communicating with ProFax with respect to all of the fax blasts at issue in this case, and two other employees were responsible for determining what fax target lists would be sent to Profax. R. 68-6 at 41-44. Defendants' employees do not recall calling any companies on the lists to seek permission to send the faxes. R. 68-6 at 46-47; R. 68-5 at 26.

Transmission logs showing precisely to whom faxes were successfully sent by ProFax at defendants' direction no longer exist. ProFax sends its clients transmission logs via email providing the date and time of each transmission and whether it was successful, but that data is deleted in less than six months unless a client requests that it be retained. R. 68-7 at 19-20. ProFax could not find any of the fax transmission logs for defendants' account. *Id.* Defendants' employee in charge of communicating with ProFax testified that he deleted the transmission logs soon after receiving them because they were "heavy files." R. 68-6 at 31-36, 92.

Practice Management did obtain through discovery in this litigation 21 ProFax invoices associated with defendants' account that show the total number of faxes successfully sent by ProFax on certain dates (as well as the total number of faxes attempted that were not successful). R. 68-4; R. 68-7 at 12-13. The ProFax

invoices correspond with 16 different ads for which plaintiffs obtained images during discovery. *See* R. 68-3; R. 68-4; R. 68-10.[2] Practice Management also obtained four fax target lists—*i.e.*, excel spreadsheets showing names, addresses, fax numbers, and other data for fax targets. R. 68-11.

Practice Management's expert Robert Biggerstaff produced a report adding together the number of faxes shown as sent in the ProFax invoices for the 16 ads, calculating a total of 40,146 successfully sent faxes. R. 68-10 at 8-9. Biggerstaff also matched four of the ProFax invoices to the four fax target list excel spreadsheets. R. 68-10 at 8-9. He concluded that a spreadsheet titled "cirRockford.xls" corresponds with the invoice for "Rockford Special Offer," a spreadsheet titled "cirROCKFORD_school.xls" corresponds with the invoice for "Rockford Schools," a spreadsheet titled "List_Chicago_Vaudeville _Faxblast_June 2009" corresponds with the invoice for "Chicago Group Fax," and a spreadsheet titled "List_Colorado.xls" corresponds with the invoice for "Denver Group Fax." *Id.* at 9.

A large percentage of the entries in three of these spreadsheets appear to be for Illinois businesses and residents. In the "cirRockford.xls" spreadsheet, 3,927 (82%) of the addresses show "IL" as the "PRIMARY_STATE." *Id.* at 7. In the "cirROCKFORD_school.xls" spreadsheet, 730 (79%) of the addresses show "IL" as the "PRIMARY_STATE." *Id.* In the "List_Chicago_Vaudeville _Faxblast_June 2009" spreadsheet, 10,869 (94%) of the addresses show "IL" as the "PRIMARY_STATE."

---

[2] The invoices also refer to other ads for which "no fax image [was] produced in discovery . . . and therefore [Practice Management] has not moved to certify as to these successfully sent fax advertisements." R. 68-1 at 9.

*Id.* In the "List_Colorado.xls" spreadsheet, by contrast, all of the addresses show "CO" as the "PRIMARY_STATE." *Id.*

The ad sent to Practice Management and attached to the complaint in this case contains the following opt-out notice at the bottom in fine print:

> To opt out from future faxes go to www.deletemyfaxnumber.com. Enter pin # 15263 or call 877-284-7878. The recipient may make a request to the sender not to send any future faxes and failure to comply with the request within 30 days is unlawful.

R. 1 at 12; R. 68-7 at 9. Practice Management alleges that this opt-out notice was deficient (although its complaint does not specify why). R. 1 ¶ 19. ProFax retained an opt-out list associated with defendants' account, which is comprised of 935 fax numbers. R. 153 at 4; R. 161 at 3.

## Standard

To be certified, a putative class must satisfy the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). The action also must satisfy at least one of the three subsections of Rule 23(b). *Id.* Here, plaintiffs seek certification under Rule 23(b)(3), which requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

"Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements." *Messner*, 669 F.3d at 811. "The Rule does not set forth a mere pleading standard"; rather, the plaintiff must satisfy Rule 23 "through evidentiary

proof." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013). "It is sufficient if each disputed requirement has been proven by a preponderance of the evidence." *Messner*, 669 F.3d at 811. "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Comcast*, 569 U.S. at 33-34 (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011)). But "[m]erits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466 (2013).

District courts have "broad discretion" when determining whether a proposed class satisfies Rule 23. *Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 528 (7th Cir. 2012); *see also Dukes,* 564 U.S. at 369 ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court.").

## Discussion

"Class certification is normal" under the TCPA "because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). Judges in this district have certified dozens of TCPA fax cases. *See* R. 68-1 at 11 n.7 (collecting cases). And this case does not implicate the individualized consent issues that have been held to defeat class certification in a number of recent cases applying the Federal Circuit's decision in *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017), *cert. denied sub nom. Bais Yaakov of Spring Valley v. F.C.C.*, 2018 WL 942804 (U.S. Feb. 20, 2018). *See, e.g., Alpha Tech Pet Inc. v. LaGasse, LLC*, 2017

WL 5069946, at *4-8 (N.D. Ill. Nov. 3, 2017); *Brodsky v. HumanaDental Ins. Co.*, 269 F. Supp. 3d 841, 849-51 (N.D. Ill. 2017).

Although defendants pull out all the stops, including in several motions to cite supplemental authority that are in reality lengthy additions to their class certification opposition, they do not raise any arguments that differentiate this case sufficiently from the many other TCPA cases in which class certification has been granted under this Circuit's law. The Court does, however, find that the Supreme Court's recent ruling in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017)—addressed in defendants' third motion for leave to file supplemental authority (R. 150)—prevents this Court from exercising personal jurisdiction over non-Illinois-resident class members.

## I.    Class Scope

As a threshold matter, defendants take issue with what they characterize as Practice Management's belated attempt to revise and broaden the scope of its class claims. They say that class certification should be denied outright on this basis.

Practice Management's complaint identified the following class:

> All persons who (1) on or after April 19, 2007, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of Defendants, (3) from whom Defendants did not obtain prior express permission or invitation to send those faxes, (4) with whom Defendants did not have an established business relationship and (5) which did not display a proper opt out notice.

R.1 at 4. Practice Management now seeks to certify the following class:

> All persons or entities who were successfully sent a facsimile from "Cirque du Soleil" from January 29, 2009, through July 8, 2009,

offering tickets for sale to the following performances: [1] "Saltimbanco" at Rockford MetroCentre, Rockford, Illinois, opening February 25, 2009; [2] "A New Twist on Vaudeville" at Chicago Theatre, Chicago, Illinois, opening November 19, 2009; [3] "Kooza" at Pepsi Center Grounds, Denver, Colorado, opening August 20, 2009; [4] "Kooza" at Santa Monica Pier, Santa Monica, California, opening October 16, 2009; [5] "Kooza" at Orange County Great Park, Irvine California, opening January 7, 2010; [6] "Kooza" at the Broadway/Kellog Lot, St. Paul, Minnesota, opening July 3, 2009; [7] "Saltimbanco" at Conseco Fieldhouse, Indianapolis, Indiana, opening February 12, 2009; [8] "Saltimbanco" at USA Mitchell Center, Mobile, Alabama, opening April 2, 2009; [9] "Saltimbanco" at Sommet Center, Nashville, Tennessee, opening April 9, 2009; [10] "Saltimbanco" at North Charleston Coliseum, North Charleston, South Carolina, opening April 22, 2009; [11] "Saltimbanco" at Von Braun Center, Huntsville, Alabama, opening April 15, 2009.

R. 68 at 2.[3]

Defendants argue that Practice Management's revised class definition expands the scope of the putative class impermissibly in two different ways: (1) the first definition was "based on the single July 7, 2009 Ad featuring the Vaudeville show," whereas the new definition focuses on "18 fax broadcasts involving 15 completely different faxes on different dates promoting two separate touring shows"; and (2) the original definition focused on faxes advertising "Defendants' goods and services," whereas the new definition focuses on faxes sent "from 'Cirque du Soleil.'" R. 125 at 12. Both arguments misconstrue the class definitions.

With respect to the first argument, Practice Management did not limit its class definition in its complaint to fax broadcasts of the July 7, 2009 Vaudeville ad.

---

[3]    Although only 11 shows are listed in Practice Management's class definition, some of the shows had several different ads associated with them. *See* R. 68-1 at 9-11; R. 68-3. Thus, the 16 different ads for which Practice Management obtained images during discovery correspond with the 11 shows listed in Practice Management's proposed class definition.

Although the complaint pleaded that Practice Management received the July 7, 2009 Vaudeville ad, R. 1 at 3, the complaint's class definition included "[a]ll persons" who were sent ad faxes "by or on behalf of Defendants" any time "on or after April 19, 2007" that failed to comply with TCPA opt-out notice requirements. *Id.* at 4. The complaint further alleges that defendants sent "the same *and similar* unsolicited facsimiles" to the class, and that the class covered "Exhibit A [the July 7, 2009 Vaudeville ad] *and other* unsolicited faxed advertisements." R. 1 at 4, 5 (emphasis added). Practice Management's revised class definition thus narrows rather than broadens the scope of the class to focus on specific ads—namely, ads for which Practice Management obtained the fax image and a corresponding ProFax invoice in discovery. And as defendants acknowledge (R. 125 at 6), these fax images and corresponding invoices were all produced during discovery as part of an earlier, related federal action (*see id.* at 6, 22; R. 125-1), so their inclusion cannot have come as a true surprise to defendants.

Defendants' second argument is based on another misreading of the complaint's class definition. Defendants claim that the complaint's class definition was limited to "people who received faxes advertising *Defendants'* goods and services." R. 125 at 12. In fact, the complaint definition included "persons . . . *sent* telephone facsimile messages of material advertising the commercial availability of *any* property, goods, or services *by or on behalf of* Defendants." R. 1 at 4 (emphasis added). This definition did not limit the class to recipients of fax advertisements for "*Defendants'* goods and services." Rather, it defined the class as recipients of fax

advertisements for "any" goods and services as long as they were "sent . . . by or on behalf of Defendants."

As Practice Management explains, it based the definition in its complaint on the FCC regulation defining the "sender" of a fax advertisement as a "person or entity on whose behalf a facsimile unsolicited advertisement is sent . . . ." 47 C.F.R. § 64.1200(f)(1). Practice Management indicates that it changed "by or on behalf of Defendants" to "from 'Cirque du Soleil'" in its revised class definition to avoid a fail-safe problem created when a class definition is too closely tied to the statutory elements. As this Court has previously explained, "[i]n cases . . . under the TCPA, it can be tempting for a plaintiff to define its class in terms of the statutory elements that establish liability. . . . But this focus on the terms of liability frequently results in class definitions that are fail-safe." *Alpha Tech Pet Inc. v. Lagasse, LLC*, 205 F. Supp. 3d 970, 976-77 (N.D. Ill. 2016). A fail-safe class is a problem because "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. A definition focusing on the content of the particular faxes at issue "avoids the problem of a fail-safe class because it is grounded in the particular factual circumstances that allegedly led to [the] injury." *Alpha Tech Pet*, 205 F. Supp. 3d at 978.

The Court agrees that Practice Management's revised definition works to avoid a fail-safe problem and to make the class ascertainable. *See also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660-61 (7th Cir. 2015) (to be ascertainable, a class definition must identify "a particular group of individuals . . . harmed in a

particular way . . . during a specific period," and must not be "defined in terms of success on the merits" to avoid a fail-safe problem). The Court further takes Practice Management's suggestion to change "from 'Cirque du Soleil'" to "containing the 'Cirque du Soleil' trade name" to make the proposed definition even more clearly content-based. *See* R. 137 at 4.

The foregoing discussion shows why defendants' reliance on *Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015), in support of their argument for denying class certification on this threshold basis is misplaced. In *Chapman*, the plaintiff sought to change to a theory of TCPA liability based on lack of compliant opt out notices after the district court held that individualized questions precluded certification under the plaintiff's original, consent-based theory of TCPA liability. *Id.* at 785. The district court rejected plaintiff's "attempt to remake a suit more than four years after it began," and the Seventh Circuit held that the district court had not abused its discretion. *Id.* The issue in *Chapman* was not that the plaintiff changed its class definition from the one in its complaint. Indeed, the *Chapman* court made clear that a complaint need not even contain a class definition, and "the obligation to define the class falls on the judge's shoulders" when certifying a class action. *Id.* (citing Fed. R. Civ. P. 23(c)(1)(B)). Rather, the issue in *Chapman* was that plaintiff changed the theory of liability late in the case.

Here, unlike in *Chapman*, Practice Management is not seeking to change its theory of liability. It always has premised its case on an opt-out notice theory. Consent is not an issue in this case because there is no claim or evidence of prior

express permission by any fax recipient. Practice Management has simply refined its class definition between its complaint and its class certification motion to make it more specific and to avoid a potential fail-safe problem. The Court therefore declines to deny class certification on this threshold basis identified by defendants. The Court does, however, note that the class definition will become much narrower than Practice Management's current proposed definition based on the Court's personal jurisdiction holdings below.

## II. Rule 23(a) Requirements

The Court turns to whether the putative class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation.

### A. Numerosity

The numerosity requirement of Rule 23(a)(1) is satisfied where joinder of all putative class members is "impracticable." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). "[A] class of forty is generally sufficient." *Id.* Defendants do not contest that the numerosity requirement is easily satisfied in this case based on the numbers of faxes at issue.

### B. Commonality

Commonality requires the plaintiff to demonstrate that the putative class members' "claims . . . depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350.

Practice Management brings only one claim—an alleged violation of the TCPA. The TCPA prohibits (with certain exceptions) the use of "any telephone facsimile machine . . . to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). It also creates a private right of action allowing the recipient of an unsolicited fax to "recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). To prevail on a claim under the TCPA, a plaintiff must show that the defendant: "(1) used a telephone facsimile machine, computer or other device to send a facsimile; (2) the facsimile was unsolicited; and (3) the facsimile constituted an advertisement." *Hinman v. M & M Rental Center, Inc.,* 545 F. Supp. 2d 802, 805 (N.D. Ill. 2008). An unsolicited advertisement does not violate the TCPA, however, if it "contains a notice meeting the requirements under paragraph 2(D)." 47 U.S.C. § 227(b)(1)(C)(iii). Paragraph 2(D) in turn sets forth a number of specific requirements, including that the opt-out notice be "clear and conspicuous." 47 U.S.C. § 227(2)(D). Practice Management claims that the faxes in this case were unsolicited advertisements that did not contain compliant opt-out notices.

Addressing a similar TCPA class action involving faxes that lacked compliant opt-out notices, the Seventh Circuit in *Turza* explained that "class certification is normal" in such cases "because the main questions, such as whether a given fax is

an advertisement, are common to all recipients" and have common answers. 728 F.3d at 684. As in *Turza*, key questions in this case—including whether defendants qualify as senders,[4] whether the faxes were solicited, whether they were advertisements, whether they contained complaint opt-out notices, and the appropriate remedies—have common answers that are all "apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. Thus, the Court finds—and defendants do not dispute—that commonality is satisfied.

## C. Typicality

"A claim is typical if it [1] arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [2] [the] claims are based on the same legal theory." *Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir. 2008).

Practice Management maintains that typicality is easily satisfied in this case. It says its claim arises from the same practice or course of conduct as other putative class members' claims—namely, defendants' alleged practice of using a single fax broadcaster (ProFax) to send, at the direction of the same defendant employees, unsolicited faxes bearing the Cirque du Soleil trade name to promote shows during a discrete period of time. And, Practice Management says, its claim and the putative class members' claims are based on the same legal theory of unsolicited advertisements sent without compliant opt-out notices under the TCPA. As Practice Management explains, courts routinely hold that these facts make a named

---

[4]     The Court further explains why this is a common issue in its typicality discussion below.

plaintiff's claim typical in a TCPA case. *E.g.*, *Holtzman v. Turza*, 2009 WL 3334909, at *5 (N.D. Ill. Oct. 14, 2009) ("because the course of conduct that produced his claim also produced the claims of the proposed class, and plaintiff brings the same TCPA claim that will be advanced by the class, plaintiff's claim is typical of those of the class"); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.*, 2008 WL 3889950, at *4 (N.D. Ill. Aug. 20, 2008) (same).

Defendants try to parse the question more finely, arguing that Practice Management's claims are not typical because Practice Management was sent only the single fax attached to the complaint, but it seeks to represent a class of people or entities sent faxes on different dates advertising other shows. The Eastern District of Missouri rejected a similar argument in a TCPA fax case where the defendant sent fax advertisements in ten different broadcasts over two years targeting physicians in five practice areas and the plaintiff received only the last broadcast. *St. Louis Heart Ctr., Inc. v. Vein Centers for Excellence, Inc.*, 2013 WL 6498245, at *1, *7 (E.D. Mo. Dec. 11, 2013). The court found the named plaintiff's claim typical because the defendant "engaged in a standardized course of conduct vis-à-vis the putative class members, including [named plaintiff], by faxing advertisements (via Westfax [a fax broadcasting company]) to thousands of people at a time." *Id.* at *7. The court explained that if any evidence emerged showing that the opt-out notice provisions were different among groups of faxes, "division of the class into subclasses may be appropriate," but as it stood, "the evidence tend[ed] to

show that the advertisements were sent out *en masse* with virtually identical content and that [named plaintiff's] claim is typical of the class." *Id.* at *7.

Although it has not addressed a typicality argument like defendants' in a TCPA case, the Seventh Circuit rejected a similar argument in the Fair Debt Collection Practices Act context. In *Keele v. Wexler*, the Seventh Circuit held that the named plaintiff's claim was typical because it was based on the same "course of conduct" and "legal theory" as other putative class members' claims, even though the letter the named plaintiff received was only one of a number of different forms used by defendants to collect on debts. 149 F.3d 589, 595 (7th Cir. 1998); *see also Keele v. Wexler*, 1996 WL 124452, at *1, *3 (N.D. Ill. Mar. 19, 1996). And the Seventh Circuit in *Turza* upheld certification of a class where the defendant sent numerous faxes with the content changing over time, some of which the named plaintiff received and some of which he did not, without questioning whether the named plaintiff's claim was typical. 728 F.3d at 683-84.

In other words, typical does not mean identical. As the Seventh Circuit explained in *Keele*, the typicality inquiry "is closely related to the question of commonality." 149 F.3d at 595. What matters is whether "a class representative's atypical claim may prevail on grounds unavailable to other class members, leaving them in the lurch," or whether a class representative's claim may fail even "though the claims of other class members may be valid." *CE Design, Ltd. v. King Architectural Metals, Inc.* 637 F.3d 721, 724 (7th Cir. 2011). In *Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009), for example, the Seventh Circuit held that a

named plaintiff's claim was not typical where "as a result of . . . differences" between the named plaintiff's claim and class members' claims, "certain provisions of [the operative statute] that apply in [named plaintiff's] case may not apply to most of her proposed fellow class members," meaning that she may not have an "incentive to litigate vigorously" on their behalf. *Id.* at 492-93. Here, unlike in *Muro*, the fact that similar-looking advertisements bearing the same Cirque du Soleil trade name and sent out by ProFax during a discrete period of time were for different theatrical shows on different dates does not mean that different legal provisions apply or otherwise change the common questions in this case. *See id.*[5]

---

[5] Nor is Practice Management asserting many separate legal claims like in *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000), on which defendants rely. In *Prado-Steiman*, the district court "identified ten substantive, classwide claims" in the class it certified. *Id.* at 1270. The Eleventh Circuit reversed and remanded for an assessment of standing, holding that "[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." *Id.* at 1279. In other words, at least one named plaintiff had to have standing to assert each claim in order to satisfy typicality. *Id.*

Here, defendants do not contest Practice Management's standing to raise a TCPA claim based on the fax it was sent. R. 68-1 at 7, 11; R. 68-10; *see also, e.g.,* *Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.,* 2017 WL 5001284, at *3 (N.D. Ill. Nov. 2, 2017) ("post-*Spokeo* [*Inc. v. Robins*, 136 S. Ct. 1540 (2016)], courts in this Circuit have repeatedly held that mere receipt of a fax alleged to lack TCPA opt-out notices constitutes sufficient harm for purposes of Article III standing") (collecting cases). And unlike in *Prado-Steiman*, Practice Management raises only a single TCPA claim resulting in the same basic injury across class members. *See* R. 1. In similar circumstances, other courts have found Article III standing and typicality satisfied. *See, e.g., Hinman*, 545 F. Supp. 2d at 805-07 (Article III "does not require that the class representative's injury be based on exactly the same fact pattern as every class member," and where defendant "sent fax transmissions to the class under the same general circumstances, those transmissions—if found to violate the TCPA—would result in the same basic injury to all class members. Therefore, plaintiffs have Article III standing to pursue the class claims," and plaintiffs' claims are typical.).

Defendants say they have a unique defense against Practice Management that they do not have against other class members. They maintain that the Practice Management's claim "is invalid" because "the July 7, 2009 Ad" that Practice Management received "*does not* advertise *Defendants'* goods or services." Instead, defendants say, the July 7, 2009 ad promotes a show presented and operated by Cirque du Soleil Burlesco, a separate entity allegedly created for the sole purpose of operating and receiving revenue from the Vaudeville show. R. 125 at 19. Defendants imply that other entities may have been created to operate and receive revenue from the Saltimbanco and Kooza shows promoted in the other ads. *See* R. 125 at 13.

But this argument misunderstands Practice Management's legal theory with respect to the "sender" element of its claim. "The fax sender is defined in federal regulations as either [a] the person 'on whose behalf' the unsolicited ad is sent or [b] the person whose services are promoted in the ad." *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 200 (2016) (quoting 47 C.F.R. § 64.1200(f)(10) (defining "sender" as a "person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement")). Practice Management's theory is not based on the second, services-promoted prong of these regulations, as to which defendants' argument would be relevant.[6] Instead, Practice

_____

[6]     Nor would the fact that defendants' goods or services were being advertised, in and of itself, satisfy this second prong. The Seventh Circuit held in *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793 (7th Cir. 2016*), cert. denied,* 137 S. Ct. 637 (2017), that a literal interpretation of the "Defendants' goods or services" prong "would lead to absurd and unintended results," where "if a competitor of

Management's theory is based on the first, on-whose-behalf prong. Practice Management maintains that defendants are "senders" because they contracted with ProFax to send unsolicited faxes on their behalf.

And this legal theory is consistent across the class. Crucially, defendants admit that defendant "Cirque du Soleil, Inc. purchased fax lists and contracted with and paid ProFax to send the July 7, 2009 Ad promoting the Vaudeville Show." R. 125 at 7. The evidence supports that it did the same with respect to the other advertisements at issue. R. 68-8; R. 68-5 at 15, 16. Although the Court need not decide merits questions at this stage, it notes that this admission and evidence likely satisfies the standard for "sender" liability recently approved by the Seventh Circuit in *Paldo Sign*: a defendant is liable for faxes sent by a fax broadcaster on its behalf where the defendant "caused by words or conduct the fax broadcaster . . . to believe reasonably that [defendant] approved the sending of the fax broadcast transmission." 825 F.3d at 797. In any event, the question of whether contracting with and paying ProFax to send ads makes one or more defendants "senders" liable under the first, on-whose-behalf prong of the regulations is common among Practice Management and the rest of the putative class—it can be decided in a single stroke. That also means that Practice Management's legal theory with respect to the sender element of its TCPA claim is typical of the rest of the class.

---

[defendant] sent out ten thousand unsolicited fax advertisements promoting [defendant's] services, the resulting lawsuit could bankrupt [defendant] even though [defendant] played no part in sending the faxes." *Id.* at 797. The *Paldo Sign* court held that for a defendant to be liable under the second prong of the regulations, it "must have done something to advertise goods or services." *Id.*

In sum, because Practice Management's claim is based on the same course of conduct (sending fax blasts through the same fax broadcaster, at the direction of the same employees, bearing the Cirque du Soleil trade name, and promoting Cirque shows during a discrete period of time) and legal theory (an opt out notice theory based on faxes sent on behalf of defendants) as the other class members it seeks to represent, the Court holds that typicality is satisfied.

## D.    Adequacy

Rule 23(a)(4) requires representative parties—both the named plaintiff and class counsel—to "fairly and adequately represent the class." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). This requirement deals with "concerns about the competency of class counsel and conflicts of interest" between the class and its representatives. *Dukes,* 564 U.S. at 349 n.5.

First addressing Practice Management's competency as putative class representative, Practice Management's owner John Zulaski filed a declaration explaining that Practice Management has been involved in the litigation and is willing to do whatever is necessary to protect the interests of the absent class. R. 68-9 ¶¶ 8, 9. Practice Management rejected an earlier settlement offer based on its obligations and responsibilities to the class, and it is unaware of any conflicts with absent class members. *Id.* ¶¶ 9, 10. Defendants do nothing to counter these representations or to show that Practice Management is inadequate.

Next turning to putative class counsel's adequacy, Rule 23(g) describes four factors for a court to consider: "(i) the work counsel has done in identifying or

investigating potential claims in the action; (ii) counsel's experience in handling class actions . . . ; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 919 (7th Cir. 2011) ("In response to growing concerns with the adequacy of representation by class counsel, Rule 23 was amended in 2003 . . . by the addition of a new subsection, (g), to guide the court in assessing proposed class counsel as part of the certification decision.").

Here, putative class counsel—Anderson + Wanca and the Margulis Law Group—satisfy all four factors. With respect to the first factor, putative class counsel have done significant work in identifying or investigating the claim in this case. Anderson + Wanca have been pursuing claims related to the fax campaign at issue since 2009. With respect to the second and third factors, putative class counsel have considerable experience and knowledge of this area of the law. Both Anderson + Wanca and the Margulis Law Group have been appointed lead or co-lead counsel in many TCPA cases. *See* R. 68-12 (Anderson + Wanca firm resume); R. 68-13 (Margulis firm resume); *see also*, *e.g.*, *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) (Anderson + Wanca's "experience in TCPA class action demonstrates that counsel is adequate"); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324, at *6 (N.D. Ill. Aug. 20, 2009) (finding Anderson + Wanca adequate in TCPA case); *Turza*, 2009 WL 3334909, at *5 (same). Anderson + Wanca also has filed a petition in the Supreme Court challenging the Sixth Circuit's

decision in *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017), addressing issues discussed later in this opinion. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc., petition for cert.* (U.S. Dec. 4, 2017) (No. 17-803). Finally, with respect to the fourth factor, both firms have "expressly committed to devote adequate human and financial resources to properly represent their class clients." *Franklin Bank*, 2008 WL 3889950, at *4; *see* R. 68-1 at 16. An analysis under Fed. R. Civ. P. 23(g) thus supports that putative class counsel will adequately protect the class' interests.

Defendants argue that the history of this litigation (set forth in more detail in this Court's opinion on defendants' first summary judgment motion, R. 63) establishes putative class counsel's inadequacy. They accuse putative class counsel of "seeking to use tolling and subsequent lawsuits to: (1) excuse their failure to comply with court orders and deadlines in the [earlier, related] Federal Action; and, (2) forum shop and judge shop." R. 125 at 21 (citing in support prior summary judgment filings).

As an initial matter, the Court takes issue with defendants' "incorpor[ation] by reference" of their summary judgment briefing to support their adequacy argument, which "effectively negate[s]" the local rule's page-limit requirements (that defendants were already given leave to exceed). *See, e.g., Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590, 592 (N.D. Ill. 2013). Defendants also filed a lengthy motion for leave to file supplemental authority and corresponding reply addressing this issue. R. 140. Although the Court does not deny defendants' motion

for leave to file supplemental authority, it does find defendants' back-door circumvention of page limits inappropriate.

The Court also disagrees with defendants that the circumstances here are akin to those in *Physicians Healthsource, Inc. v. Allscripts Health Solutions, Inc. & Allscripts Healthcare, LLC*, 254 F. Supp. 3d 1007 (N.D. Ill. 2017)—the supplemental authority defendants cite in support of their adequacy argument. In *Physicians Healthsource*, Magistrate Judge Cole recognized that under Seventh Circuit precedent, "[n]ot any ethical breach justifies the grave option of denying class certification." *Id.* at 1032. But Judge Cole found that based on the facts in that case, putative class counsel had "jeopardize[d] the court's ability to reach a just and proper outcome." *Id.* Those facts included the filing of false interrogatory responses and related credibility issues in a deposition, difficulty meeting discovery deadlines, and "difficulties with page limitations." *Id.* at 1030-33. Judge Cole found that this misconduct satisfied the Seventh Circuit's standard of prejudicing the class or creating a conflict with the class so as to render class counsel inadequate. *Id.* at 1032.

These circumstances are not present here. It is true that this litigation has a long and complex history, involving many prolix filings. But the Court finds both parties responsible for that history. Both parties have, for instance, filed multiple oversized briefs in this case. *See* R. 143 at 5. And with respect to the related, prior litigation, the multiple suits were in part putative class counsel's doing, but in part due to the array of corporate entities defendants have established (including Cirque

du Soleil Burlesco, the entity discussed above), which resulted in the current defendants not being sued in the first federal action. *See* R. 143 at 6; R. 140 at 5 (explaining that class counsel filed related state court action because federal judge denied plaintiff the ability to add other Cirque corporate entities who were more appropriate defendants). As this Court found in its summary judgment opinion, "there is no evidence that either of the [prior, related] actions were frivolously filed to toll time." R. 63 at 11.

The Court also disagrees with defendants' arguments that putative class counsel are inadequate because they: (1) continued pursuing this case despite the alleged defense discussed above pertaining to Cirque du Soleil Burlesco's operation of the Vaudeville show; and (2) included ads in addition to the July 7, 2009 Vaudeville ad (all of which were identified in discovery years earlier) in their proposed class definition. To the contrary, putative class counsel's adequacy is demonstrated by their prior success in this case, including defeating two prior dispositive motions filed by defendants. *See* R. 63; R. 116.

In sum, the Court finds that both Practice Management and putative class counsel meet the adequacy requirement for class certification.

## III.  Rule 23(b)(3) Requirements

Plaintiffs seek certification under Rule 23(b)(3). This means that in addition to the Rule 23(a) requirements, plaintiffs also must show that "[1] questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Court addresses each of these factors in turn.

## A. Predominance

"There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814. "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Id.* at 815. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.*

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 536 U.S. 804, 809 (2011)). As set forth above, most of the questions relevant to Practice Management's TCPA claim in this case are common to the class, including whether defendants qualify as senders, whether the faxes were solicited, whether they were advertisements, and whether they contained proper opt-out notices. The question of appropriate remedies also is common to the class. *See, e.g.*, *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill.

2014) (in TCPA case, "defendants' contention about calculation of individual damages is a non-issue in terms of predominance. Plaintiffs are asking only for statutory damages, which eliminates individual variations.").

Defendants argue that "individualized inquiries are necessary to determine whether—and which—members of Practice Management's proposed class were 'successfully sent' a fax." R. 125 at 2. This argument can be broken down into two parts. First, there are the questions of whether faxes were successfully sent (for purposes of TCPA liability), and if so, how many total (for purposes of calculating statutory damages). Class members can make a prima facie showing as to both of these questions based on common evidence: the ProFax invoices showing both that faxes were successfully sent and the total number of faxes successfully sent as part of each broadcast.

To the extent defendants challenge the reliability of the ProFax invoices to make such a showing (*see* R. 125 at 14), that position is foreclosed by the Seventh Circuit's decision in *Turza*. There, like here, a fax broadcasting company sent the faxes, and data from that company showed the total number of faxes "delivered successfully" (in that case, 8,630 of 11,945 faxes attempted). 728 F.3d at 684-85. The Seventh Circuit explained that "no reasonable juror could conclude that these data are inaccurate." *Id*. The district court appropriately calculated damages by subtracting the total number of faxes received by class members who opted out (200) from the total number delivered successfully (8,630), and multiplying the resulting 8,430 number by the statutory penalty. *Id*. There was "no need for

recipient-by-recipient adjudication, and the district court did not err in concluding 'that the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Id.* at 685 (citing Fed. R. Civ. P. 23(b)(3)).

The second part of Practice Management's argument goes to class member identification—*i.e.*, identifying to whom the faxes were sent. It is with respect to this issue that the absence of the fax transmission logs showing who successfully received the faxes presents a problem. As described in the petition for certiorari in *Sandusky*, courts of appeals are split as to whether class identification issues like this one pertain to class ascertainability, predominance, or superiority. *Sandusky*, *petition for cert.* at 22-29 (U.S. Dec. 4, 2017) (No. 17-803). But the Seventh Circuit's position on this issue is clear. It squarely held in *Mullins* that class identification issues relate to "superiority" under Rule 23(b)(3). 795 F.3d at 664; *see also Birchmeier*, 302 F.R.D. at 253-54 ("arguments about whether someone belongs in the classes do not speak to whether common questions predominate *among class members*; those who are in the classes will be those who can document that they meet the class definitions. Rather, these arguments go to whether an individual may join the classes," which "is more appropriately addressed under the manageability" component of the superiority requirement). The Court therefore addresses this question as part of its superiority analysis below.

The Court concludes that common questions predominate in this case.

### B.     Superiority

"Rule 23(b)(3)'s superiority requirement . . . is comparative: the court must assess efficiency [of a class action] with an eye toward other available methods." *Mullins*, 795 F.3d at 664. Factors used to evaluate superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desireability or undesireability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Here, factors (A), (B), and (C) plainly weigh in favor of certification. Putative class members have little economic incentive to sue individually based on the amount of potential recovery involved, there are no known existing individual lawsuits, and judicial efficiency is served by managing claims in one proceeding. *See, e.g.*, *Mussat v. Global Healthcare Res., LLC*, 2013 WL 1087551, at *7 (N.D. Ill. Mar. 13, 2013) (TCPA class superior given "fairly small potential for individual recovery" and lack of any "indication that other class members have commenced litigation against the defendants").

The central theme of defendants' opposition to class certification in this case is the absence of fax transmission logs to facilitate class identification. Defendants argue that this absence will lead to likely manageability difficulties under part (D) of Fed. R. Civ. P. 23(b)(3) (and also, as explained above, that the absence of logs defeats predominance). To be sure, there are TCPA cases supporting defendants'

position that the absence of fax transmission logs defeats class certification, including the Sixth Circuit's decision in *Sandusky* on which defendants heavily rely. *See, e.g.*, *Sandusky*, 863 F.3d at 472-73 (class certification inappropriate based on lack of superiority, ascertainability, or predominance in the absence of fax transmission logs; claims by affidavit would not suffice); *Physicians Healthsource*, 254 F. Supp. 3d at 1040-42 (no superiority where plaintiff did not have fax transmission logs for 29 of the 32 faxes at issue; notice by publication would not suffice); *Brey Corp. v. LQ Mgmt. LLC*, 2014 WL 943445, at *1 (D. Md. Jan. 30, 2014) (no ascertainability absent fax transmission logs; claims by affidavit would not suffice); *St. Louis Heart Ctr., Inc. v. Vein Ctrs. for Excellence, Inc.*, 2017 WL 2861878, at *4-5 (E.D. Mo. July 5, 2017) (no predominance absent fax transmission logs; claims by affidavit would not suffice). This question is a matter of debate among courts across the country. As well-summarized in the petition for certiorari in *Sandusky*, courts of appeals are split on the issues of whether class identification issues should be dealt with in terms of ascertainability, predominance, or superiority, and more specifically whether class membership can be determined by affidavit. *See Sandusky*, *petition for cert.* at 22-29 (U.S. Dec. 4, 2017) (No. 17-803).

But this Court is bound by Seventh Circuit law. And the Seventh Circuit in *Mullins* expressly rejected the heightened ascertainability requirement adopted by other courts of appeals that "[m]ove[s] beyond examining the adequacy of the class definition itself to examine the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." 795

F.3d at 657; *see also id.* at 661-63. A heightened ascertainability requirement, the Seventh Circuit explained, has the "effect of barring class actions where class treatment is often most needed," including in cases where "consumers are unlikely to have documentary proof." *Id.* at 658.

The *Mullins* court made clear that class member identification issues instead must be assessed in the context of "the likely difficulties of managing a class action" prong of the superiority requirement (Fed. R. Civ. P. 23(b)(3)(D)), which involves a relative assessment of the "costs *and benefits* of the class device." 795 F.3d at 657-58, 663.[7] And the *Mullins* court explained that manageability is almost never a bar to class certification. *Id.* at 664 ("refusing to certify on manageability grounds alone should be the last resort."). The court warned against "[r]elying on concerns about what are essentially claim administration issues to deny certification." *Id.* at 667-68. It explained that "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all." *Id.* at 658.

Specifically addressing manageability concerns regarding proof of claims through affidavit, the *Mullins* court instructed that courts "should not decline certification merely because the plaintiff's proposed method for identifying class members relies on affidavits." *Id.* at 672. It explained that there is only "one type of

[7]    Contrary to what defendants claim, the Seventh Circuit's decision in *Turza* does not contradict *Mullins* and hold that class member identification is a predominance issue. In *Turza*, the defendant argued that predominance was not satisfied because it was unclear "how many faxes" each class member received, requiring individual inquiries. 728 F.3d at 684. The Seventh Circuit rejected that argument, holding that fax logs answered this question. *Id.* at 685. The *Turza* court did not address the issue of class member identification squarely addressed in *Mullins*.

case in American law where the testimony of one witness is legally insufficient to prove a fact"—treason—and "[t]here is no good reason to extend that rule to consumer class actions." *Id.* at 669. And it discussed tools courts could use to combat the "risk of mistaken or fraudulent claims" and to "test th[e] affidavits as needed." *Id.* at 667, 669.

Specifically addressing manageability concerns regarding notice to class members, the *Mullins* court explained that Rule 23(c)(b)(2) "does not insist on actual notice to all class members in all cases. It recognizes that it might be *impossible* to identify some class members for purposes of actual notice." *Id.* at 665. When notice by mail is not possible, "courts may use alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members, all without offending due process." *Id.*

Applying *Mullins* in the TCPA context in a very similar situation—where discovery had revealed ProFax invoices showing how many faxes were successfully sent, but no fax transmission logs showing who got them—Judge Tharp recently granted a motion for class certification. *G.M. Sign, Inc. v. Stealth Security Sys., Inc.*, 2017 WL 3581160 (N.D. Ill. Aug. 18, 2017). Judge Tharp explained:

> At this juncture, the problem does not appear to be insoluble. To begin, there is a list of over 1,700 individuals who in response to [defendant's] fax advertisement requested not to be contacted. Even if no one beyond those individuals is ever identified, classes as small as forty people are sufficient to warrant class adjudication. [Defendant] contends that there is no "definitive means of determining whether any of the numbers on the opt-out list received the subject fax without conducting an individualized inquiry," . . . but that again conflates the issues of the adequacy of the class definition and the means of proving a claim. . . . And again, evidence of receipt may be supplemented by

other evidence, such as retained copies of faxes received, affidavits of receipt, evidence relating to fax machine ownership, or other facts that are probative of whether or not an individual received a fax described in the class definition.

*Id.* at *2.

The same reasoning applies here. Like in *Stealth Security*, there is a starting point for identifying potential class members. In *Stealth Security*, that starting point was the list of 1,700 individuals who had requested opt-outs from ProFax back in 2006. Here, it is not only the 935-member ProFax opt-out list, but also the lists of names, addresses, and fax numbers of 17,568 individuals targeted with four of the fax broadcasts at issue back in 2009.[8]

To be sure, just as in *Stealth Security*, ProFax invoices reveal that a portion of the faxes were not successfully sent to the lists targeted, and there is no way of verifying from the available data which exact faxes these were. *Compare* R. 68-10 at 18 *with Stealth Security*, 2017 WL 3581160, at *1 (ProFax invoices in that case showed that 13,518 of the initial batch of 21,291 were successful, and 37,215 of the second batch of 50,267 were successful). But as the *Stealth Security* court found, this lack of evidence goes to the issue of "the means of proving a claim." *Id.* at *2. It does not by itself make class certification unmanageable. *Id.*

To the contrary, as in other junk fax cases, notice beyond the individuals and entities on the opt-out list and four target lists can be performed by publication. *See, e.g., Birchmeier*, 302 F.R.D. at 255; *CE Design v. Beaty Const., Inc.*, 2009 WL

---

[8]     Notably, three of the four fax broadcasts for which target lists are available correspond with the two shows in Illinois. In light of the Court's holding below with respect to personal jurisdiction, these shows are the ones most relevant here.

192481, at *10 (N.D. Ill. Jan. 26, 2009). And all of the types of evidence described in *Stealth Security*, including the affidavits the Seventh Circuit found appropriate in *Mullins*, can be submitted to establish class membership. *See also, e.g.*, *Salam v. Lifewatch, Inc.*, 2016 WL 8905321, at *2 (N.D. Ill. Sept. 6, 2016) (in TCPA case, "noncustomer class members would also be able to self-identify through . . . affidavits where necessary"); *Birchmeier*, 302 F.R.D. at 245-50 (in TCPA case, permitting self-identification of claimants through affidavit).

Importantly, this process of identifying class members will "affect neither the defendant[s'] liability nor the total amount of" calculable, statutory "damages [they] owe[ ] to the class" if found liable. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017); *Mullins*, 795 F.3d at 670 (in cases "where the total amount of damages can be determined in the aggregate," "the identity of particular class members does not implicate the defendant's due process interest" because "[t]he addition or subtraction of individual class members affects neither the defendant's liability nor the total amount of damages it owes to the class"). And if found liable, defendants will have an "opportunity to challenge each class member's claim to recovery during the damages phase." *Id.* at 671. Any unclaimed portion of the damages then can be distributed via *cy pres* "to a group that will use the money for the benefit of class members." *Turza*, 728 F.3d at 689; *see also Hughes v. Kore of Indiana Enters., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) ("In a class action the reason for a remedy modeled on cy pres is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds,"

especially with statutory damages, which have an inherent "deterrent objective"). The Court therefore declines to find at this stage that proceeding by class action is unmanageable.

As numerous courts have observed, a contrary holding denying class certification based on the absence of records would create perverse incentives. If the absence of defendants' records could defeat class certification, defendants would be motivated to destroy their own records to avoid liability. *See, e.g.*, *Mullins*, 795 F.3d at 668 (declining to "effectively immunize[ ] defendants from liability because they chose not to retain records of the relevant transactions") (collecting cases); *Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 135, 139 (7th Cir. 1974) ("[c]lass actions cannot be defeated by destroying records," and defendants "cannot avoid a class suit merely because their own actions have made the class more difficult to identify"); *Beaty Constr.*, 2009 WL 192481, at *1, *3 (applying *Appleton* to support certifying a TCPA class where the fax target list had been lost or destroyed because a defendant cannot "escape liability simply by destroying the lists of its victims"); *Sadowski v. Med 1 Online, LLC*, 2008 WL 2224892, at *3 (N.D. Ill. May 27, 2008) (certifying TCPA class in the absence of fax transmission logs and holding that "it would be unfair to hold otherwise given that the missing list of recipients was last in Defendant's possession"); *Salam*, 2016 WL 8905321, at *2 ("denying class certification because Defendant is unable to provide list of potential class members would encourage defendants not to keep records, shielding themselves from liability").

This is also why it would be inappropriate to certify the class only with respect to advertisements for which defendants produced fax target lists on the basis of manageability, as defendants request in the alternative. Judge Kennelly in *Birchmeier*, a TCPA unsolicited call case, rejected a similar argument "that the contours of the class should be defined by defendants' own recordkeeping." 302 F.R.D. at 250. He explained:

> This would result in an artificial class definition that would leave out individuals who actually received the calls in question—an unquestionably objective criterion—and who possess a record that is at least circumstantial evidence of class membership, a picture they can complete with their own sworn statements. Doing this—or declining to certify a class altogether, as defendants propose—would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct. The Court does not agree that the classes should be limited in the way defendants propose.

*Id.* Like Judge Kennelly in *Birchmeier*, this Court finds that defendants cannot rely on class member identification problems resulting from their own failure to keep records to define the contours of the class.

Defendants further complain that it would be unfair for them to face exposure for the total number of faxes that the invoices show as successfully sent when few people are likely to come forward with affidavits or other identifying information regarding faxes sent back in 2009. But this claimed unfairness is a legislative problem rather than a judicial one. "[T]he [TCPA], with its draconian penalties for multiple faxes, is what it is." *Creative Montessori*, 662 F.3d at 915. Congress decided "that, to prompt compliance, the requirement needed bite in the form of at least $500 in statutory damages for each violation. Congress wanted to

put an end to unsolicited fax advertising." *Bais Yaakov*, 852 F.3d at 1085 (Pillard, J., dissenting).

In sum, at this juncture, the Court finds the superiority element met. If "class counsel cannot, down the road, propose a feasible solution for managing the litigation or for identifying and providing notice to class members, Defendants can move to decertify the class." *Toney v. Quality Res., Inc.*, 2018 WL 844424, at *21 (N.D. Ill. Feb. 12, 2018); *see also Mullins*, 795 F.3d at 664 (district courts should normally "wait and see how serious the problem may turn out to be after settlement or judgment, when much more may be known . . . And if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.").

## IV. Personal Jurisdiction

In defendants' third motion for leave to cite supplemental authority (R. 150), they argue that the Supreme Court's recent decision in *Bristol-Myers*, 137 S. Ct. 1773, "prevents this Court from asserting personal jurisdiction over the Defendants with respect to the claims of putative class members located outside of Illinois," and is therefore "relevant to this Court's consideration" of class certification. R. 150 at 5. Although the applicability of *Bristol-Myers* to class actions is far from a settled issue, *see, e.g.*, *DeBernardis v. NBTY, Inc.*, 2018 WL 461228, at *1 (N.D. Ill. Jan. 18, 2018) (describing split among district courts), for the reasons set forth below, the Court agrees with defendants.

## A.      Applicability of *Bristol-Myers* to Federal Court Class Actions

In *Bristol-Myers*, a group of mostly non-Californian plaintiffs injured outside of California brought a mass tort products liability action against Bristol-Myers Squibb—a pharmaceutical manufacturer not subject to general jurisdiction in California—in California state court. 137 S. Ct. at 1778. The California Supreme Court held that the lower court had specific personal jurisdiction over Bristol-Myers with respect to the nonresidents' claims because those claims could be aggregated with the California residents' claims. *Id.* at 1779. The Supreme Court reversed, holding that for purposes of specific (as opposed to general) personal jurisdiction, "[t]he mere fact that *other* plaintiffs were [harmed in] California—and allegedly suffered the same injury as nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 1781.

The Supreme Court explained that the "primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum state." *Id.* at 1779. "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different state." *Id.* at 1780. But "[s]pecific jurisdiction is very different." *Id.* For purposes of "specific jurisdiction, the *suit* must aris[e] out of or relat[e] to the defendant's contacts with the *forum.*" *Id.* The Court found that defendants' rights under the Fourteenth Amendment due process clause, "acting as an instrument of interstate federalism," would be violated through an exercise of personal jurisdiction over defendants with respect to nonresidents' claims based on injuries outside the forum. *Id.* at 1780-81.

"This remains true," the Court explained, "even when third parties . . . can bring claims similar to those brought by the nonresidents." *Id.* at 1781. As Justice Sotomayor noted in her dissent, the majority decision in *Bristol-Myers* left open "the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." *Id.* at 1789 n.4.

In response to defendants' supplemental authority motion, Practice Management first argues that the reasoning in *Bristol-Myers* does not extend to class actions. Although, as noted above, courts are in disagreement about this issue, three courts in this district have recently held that *Bristol-Myers* applies with equal force in the class action context. *See DeBernardis*, 2018 WL 461228, at *2 ("The Court believes that it is more likely than not based on the Supreme Court's comments about federalism that the courts will apply *Bristol-Myers Squibb* to outlaw nationwide class actions . . . where there is no general jurisdiction over the Defendants."); *Greene v. Mizuho Bank, Ltd.*, 2017 WL 7410565, at *4 (N.D. Ill. Dec. 11, 2017) ("Nothing in *Bristol–Myers* suggests that it does not apply to named plaintiffs in a putative class action; rather, the Court announced a general principle—that due process requires a 'connection between the forum and the specific claims at issue.'") (quoting *Bristol-Myers*, 137 S. Ct. at 1781)); *McDonnell v. Nature's Way Prod., LLC*, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017) ("the analysis used in *Bristol-Myers Squibb Co.* is instructive in considering whether the

Court has personal jurisdiction over the claims" of non-Illinois-resident class members).

This Court agrees with these courts. Indeed, it not clear how Practice Management can distinguish the Supreme Court's basic holding in *Bristol-Myers* simply because this is a class action. The Supreme Court has emphasized that "Rule 23's [class action] requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that the [federal court] rules of procedure 'shall not abridge, enlarge, or modify any substantive right.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997) (quoting 28 U.S.C. § 2072(b)). The Supreme Court held in *Bristol-Myers* that the Fourteenth Amendment's due process clause precludes nonresident plaintiffs injured outside the forum from aggregating their claims with an in-forum resident. *Bristol-Myers*, 137 S. Ct. at 1781. Under the Rules Enabling Act, a defendant's due process interest should be the same in the class context.

Practice Management further argues that applying *Bristol-Myers* in the class action context is inconsistent with *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). This Court disagrees.

In *Shutts*, the Supreme Court rejected an argument that an exercise of personal jurisdiction "over the claims of nonresident class members . . . violated the due process rights *of these class members* because they lacked minimum contacts with the state." *Bristol Myers*, 137 S. Ct. at 1782 (emphasis added). The Supreme Court in *Bristol-Myers* explicitly distinguished *Shutts*, explaining that *Shutts* dealt

with the due process rights of nonresident class members—not the due process rights of *defendants*. *Id.* at 1782-83. "Since *Shutts* concerned the due process rights of [nonresident] *plaintiffs*," the Court explained, "it has no bearing on the question presented." *Id.* at 1783. The Court went on to reject respondents' argument, much like Practice Management's here, that "*Shutts* supports their position because . . . it would be 'absurd to believe that [this Court] would have reached the exact opposite result if [the defendant] had only invoked its own due-process rights, rather than those of the non-resident plaintiffs.'" *Id.* at 1783. The Court explained that the defendant in *Shutts* simply "did not assert that Kansas improperly exercised personal jurisdiction over it, and the Court did not address that issue." *Id.*

Here, by contrast, defendants are asserting an improper exercise of personal jurisdiction *over them* with respect to nonresident class members' claims. *Shutts* does not speak to this argument. *See Greene*, 2017 WL 7410565, at *4 ("*Shutts* does not speak to the propriety of asserting personal jurisdiction over a defendant").

Finally, Practice Management notes that *Bristol-Myers* left "open the question whether the Fifth Amendment['s due process clause] imposes the same restrictions on the exercise of personal jurisdiction by a federal court." 137 S. Ct. at 1784. As defendants point out, however, that open question is not relevant here. "Because the TCPA does not authorize nationwide service of process, the court . . . look[s] to Illinois law for the limitation on the exercise of personal jurisdiction." *Bakov v. Consol. Travel Holdings Grp., Inc.*, 2016 WL 4146471, at *1 (N.D. Ill. Aug. 4, 2016); *see also McDonnell*, 2017 WL 4864910, at *4 n.7 ("Because the Court is

exercising diversity jurisdiction and looking to Illinois law, however, *Bristol-Myers Squibb Co.* applies here" despite the open question about Fifth Amendment restrictions).[9]

In sum, this Court agrees with the *Greene*, *McDonnell*, and *DeBernardis* courts that *Bristol-Myers* extends to federal court class actions, at least for causes of action where courts look to state law for the limits on personal jurisdiction.

### B.    Forfeiture

Practice Management maintains that even if *Bristol-Myers* applies in the class action context as a general matter, defendants have forfeited any personal jurisdiction defense by not raising it in their answer (R. 11) and by litigating this case for many years without raising it. The Court disagrees.

Defendants raise their personal jurisdiction defense in a motion that timely followed the Supreme Court's decision in *Bristol-Myers* making that defense available to them. The Second Circuit has rejected a similar argument that a defendant waived a personal jurisdiction defense timely raised following an intervening Supreme Court decision. *See Holzsager v. Valley Hosp.*, 646 F.2d 792, 795-96 (2d Cir. 1981). The *Holzager* court explained that "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made, especially when it does raise the objections as

---

[9]    "[W]here a federal statute authorizes nationwide service of process," by contrast, there is an open question as to whether the Fifth Amendment due process clause requires "only minimum contacts with the United States *as a whole.*" *E.g.*, *United States ex rel. Hedley v. ABHE & Svoboda, Inc.*, 2014 WL 12740150, at *5 (S.D. Ill. Sept. 16, 2014).

soon as their cognizability is made apparent." *Id*; *accord Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009) (personal jurisdiction defense not waived where prior to the time it was raised, it would have been contrary to controlling precedent). The First Circuit has likewise found that a party can be excused "for failing to raise a defense" where "the defense, if timely asserted, would have been futile under binding precedent." *Bennett v. City of Holyoke*, 362 F.3d 1, 7 (1st Cir. 2004); *accord Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir. 1983) (strict waiver rule in Rule 12(h)(1) "extends only to defenses 'then available'") (quoting Fed. R. Civ. P. 12(g)); *see also In re Micron Tech., Inc.*, 875 F.3d 1091, 1094 (Fed. Cir. 2017) ("the venue defense now raised . . . based on *TC Heartland [LLC v. Kraft Foods Group Brands, LLC*, 137 S. Ct. 1514 (2017)]'s interpretation of the venue statute was not 'available,' thus making the waiver rule of Rule 12(g)(2) and (h)(1)(A) inapplicable.").

Like in these cases, the Court finds that raising a personal jurisdiction defense as to unnamed, nonresident class members would have been "futile" (*Bennett*, 362 F.3d at 7) prior to *Bristol-Myers*. The Court therefore finds that the defense was not "then available" to defendants, Fed. R. Civ. P. 12(g), and declines to find it forfeited. *Cf. Alvarez v. NBTY, Inc.*, 2017 WL 6059159, at *6 (S.D. Cal. Dec. 6, 2017) ("The Court can see how *Bristol-Myers* may have created a new defense . . . that this Court lacked personal jurisdiction over the claims brought by the *unnamed* members to Plaintiff Alvarez's proposed multi-state class"; holding

that *Bristol-Myers* did not create a new defense as to the claims of named plaintiffs because there was a clearer, prior basis for such a defense in the law).

And even if defendants had waived this defense, the Court finds that it would be appropriate to excuse the forfeiture. Judge Feinerman excused defendant's forfeiture of a *Bristol-Myers* argument in *Greene* even though the personal jurisdiction defense as to the named plaintiff's claim in that case had a clearer basis in prior precedent. Judge Feinerman reasoned that "'[t]he court . . . retains the independent power to identify and apply the proper construction of governing law,' even where the parties 'fail[ ] to advert' to the applicable rule in their own briefing." 2017 WL 7410565, at *6 (quoting *Kamen v. Kemper Fin Servs., Inc.*, 500 U.S. 90, 99 (1991)). "Given the Supreme Court's clear holding in *Bristol-Myers* concerning the proper framework for analyzing personal jurisdiction in cases like this one," Judge Feinerman determined that "exercising the court's discretion to excuse the forfeiture [wa]s warranted." *Id.*

The Court finds that there is even more reason to excuse any forfeiture here than in *Greene*. Unlike in *Greene*, defendants are not seeking to assert a personal jurisdiction defense as to the named plaintiff Practice Management's claim. Defendants make clear that they "do not object to the court's exercise of specific jurisdiction over Plaintiff with respect to its individual claim." R. 160 at 3; *see also* R. 150 at 4 ("Because Plaintiff is an Illinois corporation that received an allegedly offending fax in Illinois . . . , Plaintiff's individual claim arises out of Defendants' alleged contact with Illinois—specifically, their alleged involvement in directing

faxes to this state"). Instead, defendants seek to assert a personal jurisdiction defense only with respect to unnamed, nonresident class members' claims. Those unnamed, nonresident class members were not even parties to the litigation until now. *See Smith v. Bayer Corp.*, 564 U.S. 299, 314 (2011) ("argument that a nonnamed class member is a party to the class-action litigation *before the class is certified*" is "novel and surely erroneous"). This fact further weighs in favor of excusing any forfeiture.

### C.  Application of *Bristol-Myers* to this Case

Finally, the Court analyzes the implications of *Bristol-Myers* in this case. "Personal jurisdiction comes in two forms, general and specific." *E.g.*, *McDonnell*, 2017 WL 4864910, at *4. The Supreme Court in *Bristol-Myers* explained that a court could validly exercise personal jurisdiction over nonresidents' claims in situations where it possesses "general jurisdiction" over the defendant. 137 S. Ct. at 1783. But there is no basis for an assertion of general personal jurisdiction here. Practice Management has acknowledged in summary judgment responses filed previously in this litigation that defendant Cirque du Soleil, Inc. is incorporated in Quebec, Canada and has its registered office in Montreal. R. 55 ¶ 5. It has also acknowledged that defendant Cirque du Soleil (US), Inc. is incorporated in Delaware and has its registered office in Las Vegas, Nevada. *Id.* ¶ 6. Therefore, this Court lacks general jurisdiction over either defendant. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("the paradigm forum for the exercise of general jurisdiction . . . for a corporation" is "one in which the

corporation is fairly regarded as home," such as its "place of incorporation" or "principal place of business"); *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) ("The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business"). Practice Management makes no argument to the contrary.

That means the only basis for this Court's exercise of personal jurisdiction over defendants is specific jurisdiction. Again, for an exercise of specific personal jurisdiction, "the *suit* must aris[e] out of or relat[e] to the defendant's contacts with the *forum*." *Bristol-Myers*, 137 S. Ct. at 1780. And under *Bristol-Myers*, "[t]he mere fact" that Practice Management received a fax in Illinois "does not allow" for an exercise of "specific jurisdiction over the nonresidents' claims" with respect to faxes received outside of Illinois (and whose claims thus do not relate to defendants' contacts with Illinois). *Id.* at 1781. Because these nonresidents' claims do not relate to defendants' contacts with Illinois, exercising specific personal jurisdiction over defendants with respect to them would violate defendants' due process rights. Thus, as in *DeBernardis* and *McDonnell*, the Court finds it appropriate to dismiss the claims of the non-Illinois-resident class members. *DeBernardis*, 2018 WL 461228, at *2 (granting motion to dismiss the claims of "out-of-state plaintiff classes"); *McDonnell*, 2017 WL 4864910, at *4-5 (dismissing claims of non-Illinois-resident class members); *see also Greene*, 2017 WL 7410565, at *6 (dismissing claims of a nonresident named plaintiff).

This ruling does not change this Court's holdings with respect to the class certification elements. In particular, numerosity is easily established "by a preponderance of the evidence" (*Messner*, 669 F.3d at 811) for a class of Illinois residents alone. The target list spreadsheets show "PRIMARY_STATE=IL" for many thousands of addresses to which ProFax sent the Rockford and Vaudeville advertisements. R. 68-10 at 7. And, at least at this juncture, the Court fails to see why the claims process could not proceed as outlined above, with the three target list spreadsheets showing primarily Illinois addresses as starting points and requiring claims affidavits to verify Illinois residency and receipt of the faxes in Illinois.

Because the impact of *Bristol-Myers* arose by way of defendants' motion for leave to file supplemental authority, the parties did not have an opportunity to brief the issue of how the class should be defined if the Court were to rule, as it has, that it lacks personal jurisdiction over defendants with respect to class members who are not Illinois residents. Defendants suggest in their motion that the "proposed class definition" could be "limited to persons or entities located in Illinois who received faxes in Illinois." R. 150 at 4. But they do not give focused treatment to this issue. And Practice Management, because its response argued that *Bristol-Myers* is inapplicable, never addressed the issue.

Because the Court "must define the class" in an order granting class certification (Fed. R. Civ. P. 23(c)(1)(B)), the Court defines the class, for current purposes, as:

> All persons who are residents of Illinois and all entities located in Illinois who were successfully sent a facsimile in Illinois containing the "Cirque du Soleil" trade name from January 29, 2009, through July 8, 2009, offering tickets for sale to the following performances: "Saltimbanco" at Rockford MetroCentre, Rockford, Illinois, opening February 25, 2009; and "A New Twist on Vaudeville" at Chicago Theatre, Chicago, Illinois, opening November 19, 2009.

The Court finds that it is unlikely, based on the current record, that any non-Illinois theatrical shows should be included within the class definition. The only available fax target list for a non-Illinois show—the target list corresponding with the "Kooza" show at Pepsi Center Grounds in Denver, Colorado, opening August 20, 2009—lists "CO" as the "PRIMARY_STATE" for all of the addresses included. R. 68-10 at 7. This means that the Colorado show almost certainly should not be included in the class definition, and further indicates that the other non-Illinois shows should not be included. The Court therefore believes its definition is proper.

If the parties believe that any modifications should be made to the current class definition—which, again, is not an issue on which the parties have previously focused—they can raise that issue at the next status conference, and the Court may allow a limited period of time for the parties to file short position papers regarding the appropriate class definition.

## Conclusion

For the foregoing reasons, the Court grants Practice Management's motion for class certification in part (R. 68), appoints Practice Management as class representative, and appoints the law firms of Anderson + Wanca and the Margulis

Law Group as class counsel. The Court also grants defendants' motions for leave to file supplemental authority (R. 140; R. 148; R. 150).

The Court finds that the Supreme Court's ruling in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), prevents it from exercising personal jurisdiction over defendants with respect to the claims of non-Illinois-resident class members. The Court therefore defines the class, for current purposes, as:

> All persons who are residents of Illinois and all entities located in Illinois who were successfully sent a facsimile in Illinois containing the "Cirque du Soleil" trade name from January 29, 2009, through July 8, 2009, offering tickets for sale to the following performances: "Saltimbanco" at Rockford MetroCentre, Rockford, Illinois, opening February 25, 2009; and "A New Twist on Vaudeville" at Chicago Theatre, Chicago, Illinois, opening November 19, 2009.

The Court sets a status conference for March 20, 2018, at which the parties should be prepared to report on next steps in this litigation. If the parties believe that modifications should be made to the current class definition, they can raise that issue at the status conference, and the Court may allow the parties to file short position papers on that limited issue.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated:  March 12, 2018